## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WISCONSIN

In re:                                                    Case Number: 12-14091-7

JOHN MILTON EDWARDS IV
and NANCY CAROL EDWARDS,

Debtors.

FORWARD FINANCIAL BANK,

Plaintiff,

v.                                                        Adversary Number: 12-195

JOHN MILTON EDWARDS IV
and NANCY CAROL EDWARDS,

Defendants.

## <u>DECISION</u>

This matter is before the Court after trial on the complaint filed by

Forward Financial Bank ("Plaintiff" or "Bank") objecting to the discharge of the

Debtors pursuant to 11 U.S.C. §§ 727(a)(2), (4), and (7) and objecting to the

dischargeability of debts owed by the Debtors to the Plaintiff under 11 U.S.C.

§ 523(a)(6).  The parties declined to file pretrial memoranda of law and, instead,

sought substantial time following trial to submit post-trial briefs.  Those briefs

have now been filed by all parties. For the reasons stated below, the Court

finds there is no ground to deny the discharge of the Debtors and there is

insufficient evidence to enable the Court to find that the debts owed to the

Plaintiff are nondischargeable as willful and malicious injuries.

## I. JURISDICTION AND PROCEDURE

The federal district courts have "original and exclusive jurisdiction" over

all cases under title 11 ("Bankruptcy Code" or "Code") and "original but not

exclusive jurisdiction" over all civil proceedings that arise under the

Bankruptcy Code or that arise in or are related to cases under the Code.

28 U.S.C. §§ 1334(a)-(b). The district courts may, however, refer such cases to

the bankruptcy judges within their district. In the Western District of

Wisconsin, the district court has made such a reference. *See* Western District

of Wisconsin Administrative Order 161 (July 12, 1984).

Accordingly, this Court "may hear and determine all cases under title 11

and all core proceedings under title 11, or arising in a case under title 11 . . .

and may enter appropriate orders and judgments, subject to review under

section 158 of this title." 28 U.S.C. § 157(b)(1). Bankruptcy courts determine

whether a proceeding is core or non-core. 28 U.S.C. § 157(b)(3). Determining

the dischargeability of a particular debt is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(I), and objections to discharge are core proceedings

pursuant to 28 U.S.C. § 157(b)(2)(J). As such, this Court has both the

jurisdiction and the authority to enter a final judgment in this matter.

## II. FACTS AND BACKGROUND

To sustain its objections to the Debtors' discharge, the Plaintiff asks the Court to engage in speculation and guesswork. In cases like this one, in which the bulk of the allegations turn on a finding that the defendant had fraudulent intent, it is usually necessary for the Court to draw *reasonable* inferences where evidence of actual intent is not available. The Court can infer intent from facts that are presented, but it cannot speculate as to the existence of facts. In the present case, most of the allegations are supported purely by Plaintiff's conjecture. To the extent the allegations have substance, they are noted below.

On July 17, 2012, the Debtors, John and Nancy Edwards, filed a voluntary petition under Chapter 7 of the Bankruptcy Code. On the petition date, Mr. Edwards was the sole shareholder and President of Edwards Electric, Inc., an electrical contracting company. Mrs. Edwards was listed as an officer. Mrs. Edwards performed some "light" bookkeeping for the company in the past. In approximately 2010, she ceased all work for Edwards Electric and returned to teaching school. From that point forward, Mr. Edwards was solely responsible for the activities of the corporation.

The Debtors purchased certain real property to be used as the business location of Edwards Electric. Subsequently, they formed Edwards Properties, LLC, to hold that real estate and other rental properties. Mrs. Edwards was the registered agent of Edwards Properties.

The Plaintiff was the lender to Edwards Electric. It financed the business under a Revolving and Term Credit Agreement and Business Note. The loan was secured by a General Business Security Agreement and a Chattel Security Agreement. The Plaintiff also financed the purchase of various parcels of real estate held by Edwards Properties. The Debtors delivered personal guaranties to the Plaintiff whereby they both guaranteed the indebtedness of Edwards Electric and Edwards Properties.

Edwards Electric began to suffer during the economic downturn and it failed to make all payments to the Plaintiff on the business loans. The Plaintiff commenced an action in state court seeking replevin of its collateral and a money judgment. It obtained a judgment on November 4, 2010. Despite the entry of judgment, Mr. Edwards was told by a bank officer that if the Debtors and Edwards Electric continued to make payments then no further action would be taken to execute on the judgment or repossess the collateral. He was also told by the bank officer that "nothing would happen" if he sold equipment, provided payments were being made.

For a period of time thereafter, the Debtors and Edwards Electric made payments to the Plaintiff and no action was taken by the Plaintiff to obtain possession of the collateral that was the subject of the replevin judgment. In fact, the Plaintiff waited approximately eighteen months after the judgment to take any action to recover its collateral.

4

In November 2011, the Plaintiff commenced a foreclosure proceeding against Edwards Properties seeking a judgment of foreclosure and a money judgment. The disposition of that action is not reflected in the record.

On April 23, 2012, Edwards Electric filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On or about July 10, 2012, the Plaintiff proceeded with the execution of a writ of replevin to take possession of the collateral. The Debtors' voluntary petition was filed on July 17, 2012, and a voluntary petition under Chapter 11 was filed by Edwards Properties on August 14, 2012.[1]

The Plaintiff alleges that both Debtors engaged in a number of transactions or acts involving personal assets that are sufficient to support both the denial of their discharge and a determination that obligations to the Plaintiff are nondischargeable. Those acts or transactions can be generally summarized as follows:

- Different values for various assets were listed on the 2010 personal financial statement than were listed for the assets in the personal bankruptcy schedules. These include the value of jewelry, household goods, snowmobiles, guns, and a boat and boat lift.

- Differences in the description of assets between the 2010 personal financial statement and the schedules. The differences include variances in the year of manufacture of various items and differences in the length of a boat.

- Omission of items from the schedules that had been identified on the personal financial statement, including trust accounts for the

---

[1] The Edwards Properties case was dismissed on February 20, 2013.

Debtors' children and "gold and silver" listed on the personal financial statement with a value of $3,500.

• Payments or transfers made within ninety days that were not listed on the Statement of Financial Affairs ("SOFA").

• The omission of certain bank accounts from the schedules that were open but had zero or *de minimis* balances on deposit.

• NSF checks written on a health savings account.

• The granting of a lien on unencumbered assets to Debtors' counsel to secure future fees in connection with the bankruptcy proceedings.

Plaintiff also complains that deposits into personal accounts were also improper and misused. No evidence was presented that accounted for or traced the deposits and their subsequent transfers other than the fact there were deposits. The Plaintiff alleges that the Debtors' income must have been misstated on the SOFA based solely on deposits into a personal account that included gifts and corporate money and transfers from one personal bank account to another.

The Plaintiff alleges there are additional bases to deny Mr. Edwards' discharge. These include the sale or disposition of assets by Edwards Electric that were not itemized in its SOFA. The Plaintiff also argues that the filing of the Edwards Electric and Edwards Properties bankruptcies support a claim of improper conduct by Debtors in a related case. The Plaintiff makes reference to the filing of the petition when the equity interests of the Debtors were – at some time – property of the individual bankruptcy estate. It should be noted that the

Edwards Electric case filing date predated the individual bankruptcy filing date. The Plaintiff also argues that the Debtors took actions as insiders of Edwards Electric to sell or conceal assets that should prevent them from receiving a discharge in their individual bankruptcy. Plaintiff does not explain the specific conduct suggested to be at issue nor did it present any facts relating to Mrs. Edwards in connection with these allegations.

The Plaintiff identified a mini-excavator sold more than one year before the petition date and three other pieces of equipment sold in January 2012 as the assets that were sold or concealed and not itemized on the Edwards Electric SOFA. The Plaintiff alleges Mr. Edwards deposited the proceeds from these sales into a personal account, rather than into the Edwards Electric business account. Plaintiff presented bank account statements showing there were deposits into the Debtors' personal accounts. However, with the exception of a record of the deposit of $8,500 related to a trencher, no evidence of the source of deposits was presented by the Plaintiff. Mr. Edwards concedes that various business funds were deposited into personal accounts but testified the funds were used for business operations. Plaintiff provided no evidence with regard to the use of funds. Further, the Plaintiff did not present any evidence of any actions by Mrs. Edwards to support claims against her that derive from the Edwards Electric or Edwards Properties bankruptcies.

Periodically, Edwards Electric would sell or dispose of equipment. The undisputed testimony is that if the equipment was no longer needed in the business or if it was older and in need of replacement, Mr. Edwards was told by the Plaintiff that he could proceed to sell, trade, or buy equipment without any further consent from Plaintiff unless a signature was required for the sale or disposition of the equipment with a document of title.  In that event, the undisputed testimony is that Mr. Edwards would bring the title document to the Bank and someone at the Bank would routinely sign the document to release any lien on the title. Mr. Edwards testified that buying and selling equipment was part of the normal course of business. He had engaged in similar sales for a number of years with the Bank's knowledge. If there was no document of title, he would simply buy and sell the items as a matter of course. This testimony is undisputed.

Despite the security interest of the Plaintiff and the replevin judgment, the handwritten (by Mr. Edwards) bill of sale for the skidsteer stated the sale was "free and clear of all liens." Mr. Edwards testified that he was aware of the judgment but that he had been told by the Bank that as long as monthly payments were being made, the Plaintiff would take no action with respect to collection or replevin.  Mr. Edwards testified he understood that this arrangement permitted the continued operation of Edwards Electric consistent with past practice. No testimony was presented to contradict or dispute this

8

explanation. The sale of the skidsteer was disclosed on the SOFA for Edwards Electric.

The sale of the tractor, the trencher, and the mini-excavator were not disclosed on the SOFA. As with the skidsteer, Mr. Edwards' explanation with respect to the tractor, the trencher, and the mini-excavator was that the sale of all three pieces of equipment was part of the normal course of business and that he did not believe he needed Plaintiff's permission based on his prior discussions with the Bank. In fact, he testified that based on his arrangement with the Plaintiff, he often sold equipment without telling the Bank.

The proceeds from these sales were, apparently, deposited into Mr. Edwards' personal bank account but were used to pay bills for Edwards Electric. He did not seek permission to use the funds but testified that he had been told by a loan officer at the Bank that "nothing would happen" if he sold the equipment. The Plaintiff did not present evidence from any of its representatives regarding these conversations, nor does it dispute this account. Accordingly, Mr. Edwards' testimony on these points is uncontroverted.

There was also a large-scale disposition of company equipment in 2011 as disclosed on the depreciation schedule attached to the corporate tax return of Edwards Electric. However, only two dispositions were disclosed in response to question 10 on the SOFA of Edwards Electric. Mr. Edwards testified that he believed the sales identified on the corporate tax return were made in the ordinary course of business, and that he did not believe he was required to

9

disclose them. A former employee of Edwards Electric also testified that it was routine for the company to sell equipment that was no longer needed or not in good operating condition. The employee further confirmed that there was a lot of equipment that was either old, in poor condition, or not needed that was disposed of sometime in 2011.

The Plaintiff asserts that Mr. Edwards attempted to hide two white trailers that were property of Edwards Electric and the collateral of the Plaintiff. The Plaintiff says that when it undertook to repossess Edwards Electric's equipment from Mr. Edwards' home, the trailers were not at that location although it had been told virtually all of the equipment was there.  The Plaintiff asks the Court to conclude this means Mr. Edwards "hid" the two trailers in order to avoid repossession. The trailers were ultimately recovered and later sold by the Plaintiff. Mr. Edwards testified that he had been confused as to the whereabouts of the trailers and thought in the chaos of the repossession that the trailers were present and had been taken by the Plaintiff.  He also testified that he did not receive a list or accounting of what was actually repossessed so he had difficulty verifying various items.

## III.  DISCUSSION

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank*, 549 U.S. 365, 367, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)). While the

10

Bankruptcy Code provides that a bankruptcy court "shall grant the debtor a discharge," it also denies the privilege of discharge to dishonest debtors under several enumerated circumstances. 11 U.S.C. § 727(a); *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). The Plaintiff must prove, by a preponderance of the evidence, that each of the Debtors is not entitled to a discharge. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)).

Even if the grounds for discharge are established, bankruptcy courts have discretion to nevertheless grant a discharge unless there is a finding that the debtor intended to violate the Bankruptcy Code. *See Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) ("[I]t remains within the discretion of the bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist") (quoting *In re Hacker*, 90 B.R. 994, 997 (Bankr. W.D. Mo. 1987)); *In re Suttles*, 819 F.2d 764, 766 (7th Cir. 1987) (citing *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984) and *Stout v. Prussel*, 691 F.2d 859, 861 (9th Cir. 1982)) ("The general rule is that the right to a discharge is left to the sound discretion of the bankruptcy court . . . and that an appellate court will not interfere with the decision of a bankruptcy court to grant a discharge unless there is a 'gross abuse of discretion.'"); *In re Garman*, 643 F.2d 1252, 1257 (7th Cir. 1980).

11

## Applicable Statutes

*11 U.S.C. § 727(a)(2)*

Section 727(a)(2) states that "[t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition."

To prevail on a claim under section 727(a)(2), the Plaintiff must prove that (1) the Debtors (2) transferred or concealed (3) property or the property of the estate (4) with actual intent to hinder, delay, or defraud a creditor or bankruptcy trustee (5) within one year prior to the bankruptcy filing or after the Debtors filed their bankruptcy petition. *See In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (citing 11 U.S.C. § 727(a)(2)(A)); *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 790-91 (N.D. Ill. 2011). For purposes of section 727(a)(2), a concealment "consists of 'failing or refusing to divulge information to which creditors were entitled.'" *Structured Asset Servs., L.L.C. v. Self (In re Self)*, 325 B.R. 224, 237 (Bankr. N.D. Ill. 2005) (citations omitted); *see Peterson v. Scott (In re Scott)*, 172 F.3d 959, 967 (7th Cir. 1999) (stating that concealment "includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known").

12

The denial of discharge under section 727(a)(2) "requires proof of actual intent to hinder, delay, or defraud a creditor." *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Actual intent, though difficult to prove, may be demonstrated by circumstantial evidence. *Village of San Jose*, 284 F.3d at 791. The Seventh Circuit has looked to a "series of factors which, if proven, indicate actual fraud":

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Id.* (citing *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). If one or more of these factors are proven by the Plaintiff, there is a presumption of intent to defraud, and the burden shifts to the Debtors to prove that they did not have fraudulent intent. *Id.*

*11 U.S.C. § 727(a)(4)*

Section 727(a)(4) provides that a discharge will be denied if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account; (B) pretended or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an

officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

To prevail on a claim under this subsection, the Plaintiff must prove by a preponderance of the evidence that: (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Neary*, 635 F.3d at 978.

"Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 789 (N.D. Ill. 2011). "Fraudulent intent may be proven with circumstantial evidence, 'and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent.'" *Cantwell*, 464 B.R. at 789 (citing *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (D.C. Cir. 1977)). Mistake or inadvertence are not grounds for denying a discharge. The "misstatement or omission must have been made knowingly and fraudulently." *Netherton v. Baker (In re Baker)*, 205 B.R. 125, 132 (Bankr. N.D. Ill. 1997). However, reckless disregard for the truth "is, at least for purposes of the provisions of the Bankruptcy Code governing

14

discharge, the equivalent of knowing that the representation is false and material." *In re Chavin*, 150 F.3d at 728.

*11 U.S.C. § 727(a)(7)*

Section 727(a)(7) provides that a debtor's discharge will be denied if "the debtor has committed any act specified in paragraph (2) . . . (4) . . . of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider."

In plain language, section 727(a)(7) extends the basis for the denial of a discharge in a debtor's personal bankruptcy if the debtor committed acts prohibited by paragraphs (a)(2) through (a)(6) of section 727 in connection with the bankruptcy case of an insider. *See In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996). The section's function is to "help induce the cooperation of individuals in related bankruptcy cases." *6 Collier on Bankruptcy* ¶ 727.10 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "Thus, if the debtor engages in objectionable conduct in a case involving . . . a corporation of which the debtor is an officer, director or controlling person, the debtor may be denied a discharge in the debtor's own case." *Id.*; *see Krehl*, 86 F.3d at 741.

*11 U.S.C. § 523(a)(6)*

Debtors that violate the Bankruptcy Code are also liable to have certain debts rendered nondischargeable. 11 U.S.C. § 523. The exceptions to discharge set forth in section 523 are confined to those plainly expressed in the Code and

15

are to be strictly construed against the objecting creditor and liberally in favor

of the debtor. *DeKalb County Div. of Family & Children Servs. v. Platter (In re*

*Platter)*, 140 F.3d 676, 680 (7th Cir. 1998); *In re Crosswhite*, 148 F.3d 879, 881

(7th Cir. 1998). The movant has the burden of proving by a preponderance of

the evidence that an exception to discharge applies. *Grogan v. Garner*, 498 U.S.

279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *Goldberg Sec., Inc. v.*

*Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citations omitted).

Among the exceptions to discharge, section 523(a)(6) prohibits the

discharge of debts "for willful and malicious injury by the debtor to another

entity or the property of another entity." The phrase "willful and malicious"

speaks of two independent requirements. For purposes of the provision, a

person acts willfully when she intends to injure or when she is substantially

certain that her conduct will cause injury to the creditor. *See Kawaauhau v.*

*Geiger*, 523 U.S. 57, 61-62, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998). An act is

"malicious" under section 523(a)(6) if it is taken "in conscious disregard of one's

duties or without just cause or excuse; it does not require ill-will or specific

intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994); *Bukowski*

*v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001). Read together, "a willful and

malicious injury, precluding discharge in bankruptcy of the debt created by the

injury, is one that the injurer inflicted knowing he had no legal justification

and either desiring to inflict the injury or knowing it was highly likely to result

from his act." *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

16

Whether conduct was willful and malicious is a question of fact reserved for the trier of fact. *In re Thirtyacre*, 36 F.3d at 700.

## Application of Law to Facts

*Claims Against Mr. and Mrs. Edwards*

A portion of the claims under sections 727(a)(2), (a)(4), and (a)(7) and under section 523(a)(6) brought by Plaintiff are leveled against both Mr. and Mrs. Edwards. The crux of these claims are that both bear responsibility for certain omissions and inaccuracies on the bankruptcy schedules or the SOFA.

The evidence indicated that, at home, Mr. Edwards was centrally responsible for bills and other family financial affairs. Mrs. Edwards had, at most, limited knowledge and responsibilities concerning the household's finances.  For instance, it became evident that she was not aware of the foreclosure proceedings against their home until long after the proceedings had commenced.  She was unaware of the $25,000 wire transfer from Mr. Edwards' grandmother.  She knew nothing about the transfers of assets from one bank account to another.  And she was even unaware of Plaintiff's intention to execute on the replevin judgment until sheriffs' deputies and bank representatives arrived at the Edwards' home.

Mr. Edwards' uncontroverted testimony was that he personally sold both business and personal property without his wife's assistance or knowledge – Mrs. Edwards had no role in the sales. Both Debtors testified that Mrs. Edwards suffered episodes of severe depression and that Mr. Edwards typically

17

shielded her from bad news. Finally, there was no indication that she had any meaningful role in the preparation or submission of the bankruptcy petitions, schedules, or related legal documents. The only evidence concerning her involvement in the preparation of the bankruptcy documents concerned the listing of bank accounts on the SOFA and the alleged omission of an account at Community Bank. Asked to account for the omission, she testified that to the best of her knowledge, the account was closed and there was no money in it. The Court found no cause to disbelieve her explanation.

Plaintiff complains that it believes various items of property were "hidden" by the Debtors. This unsubstantiated belief is a basis upon which Plaintiff requests a denial of discharge.

The Plaintiff asks the Court to assume that a 2011 snowmobile, a Polaris UTV, and gold and silver must still be owned by the Debtors and are being hidden. The evidence presented demonstrates that Mr. Edwards ordered the 2011 snowmobile from a dealership, Swiderski, in April 2010, that it was delivered in November 2010, and he then sold it. The last possible date that the sale transaction could have been completed was at the end of January 2011. Both because the uncontroverted testimony was that the snowmobile was sold and because the sale was more than one year before the petition date, the Plaintiff's claims fail with respect to the snowmobile.

Plaintiff also failed to provide any evidence to substantiate its claim that the UTV is being hidden. Mr. Edwards testified that the vehicle, which was

18

already eight years old when he bought it, stopped working, has no value, and has been abandoned. Plaintiff failed to controvert this explanation with any proof.

The evidence presented at trial shows entries on a 2010 personal financial statement for gold and silver worth $3,500. The bankruptcy schedules do not include any gold and silver. The Edwards' explanation at trial was that the gold and silver are actually coins that were given to their children as gifts from relatives. The Edwards explained they did not believe they were required to include assets of their children in their bankruptcy schedules. This explanation was uncontroverted.

There are various other differences between information contained in the Debtors' 2010 personal financial statement and the Debtors' schedules. Plaintiff suggests these discrepancies should form the basis for denial of discharge. There were trust accounts for the Defendants' three children listed on the 2010 personal financial statement. The trust accounts were not listed on the schedules. It is undisputed that the trust accounts belong to the Debtors' children. The Debtors explained they did not believe disclosure was required for these accounts because they were not owned by the Debtors.

There are differences in descriptions and information regarding two snowmobiles. Although it is clear that mistakes were made in the disclosure of the snowmobiles on the bankruptcy schedules, Mr. Edwards' testimony and the testimony of the paralegal for Debtors' counsel persuades the Court that

19

the mistakes were innocent. The omissions were clearly not intentional, but rather the result of inadvertence and miscommunication between the Debtors and their attorney.

The Plaintiff also raises a host of concerns with respect to differences in values listed by the Debtor in the 2010 personal financial statement and their bankruptcy schedules. Namely, they point to reduced values on the schedules for the Debtors' household goods, jewelry, guns, and the fishing boat and lift. When asked to explain the value difference, the Debtors indicated they were instructed by counsel to estimate the liquidation value of the assets. The figures listed on their schedules were their best estimates of such liquidation value.

Federal Rule of Bankruptcy Procedure 1007(b)(1) requires debtors to file "schedules of assets and liabilities . . . as prescribed by the appropriate Official Forms." Official Form 6B, otherwise known as Schedule B, requires debtors to disclose the "current value" of their interest in property. The term "current value" is not defined in the Bankruptcy Code or Rules. Courts are divided on the question of whether the term "current value" requires the disclosure of an asset's fair market value or whether debtors may list a liquidation value. *Compare In re Sumerell*, 194 B.R. 818, 827 (Bankr. E.D. Tenn. 1996), *In re Todd*, 194 B.R. 893, 896 (Bankr. D. Mont. 1996), and *In re Mitchell*, 103 B.R. 819, 824-25 (Bankr. W.D. Tex. 1989), *with In re Fawell*, No. 98-B-01274, Adv. No. 98-A-01306, 1999 WL 569449, at *11 (Bankr. N.D. Ill. July 26, 1999);

20

*Spencer v. Blanchard (In re Blanchard)*, 201 B.R. 108, 129-30 (Bankr. E.D. Pa.

1996); *In re Walsh*, 5 B.R. 239, 240-41 (Bankr. D.D.C. 1980).

There is a tendency to regard reported values as precise portrayals of

value. However, amounts listed on a personal or other financial statement may

be derived from various sources using varying procedures.[2] These values may

differ greatly from the actual current fair market value. Valuation is a process

and is context sensitive. An asset may have different values for different

purposes at different times. It is often a matter of a fair range of values under

the facts and circumstances presented. With a solvent debtor and a going

concern, the fair range of values may congregate around fair market value or

some multiple. On the other hand, if the debtor is a failing concern or

insolvent, the expected range of values is often more likely somewhere between

an orderly liquidation and a straight liquidation value.

The function of disclosure in the context of schedules is to disclose

enough information to put creditors and trustees on inquiry notice that an

asset may exist and what the debtor's estimate of value is. It is not a guarantee

of that asset's value.

This Court need not, however, address the proper measure of value in

this case. The root of the problem is apparent. The Debtors' attorney is a busy

and capable practitioner who left the preparation of the schedules and SOFA to

---

[2] For example, corporate financial statements often use historical cost
procedures.  Individuals, on the other hand, may simply use cost, replacement, or
insurance values.

a paralegal. While the average person should be able to provide responses to all of the queries contained in the schedules and the SOFA, that is not to say that queries within these forms cannot pose pitfalls that only an experienced legal practitioner can explain. The most obvious are "current value" used in Schedule B and "ordinary course of business" used in the SOFA.

The uncontroverted testimony at trial was that the Debtors provided values to the paralegal in accordance with the instructions they received, and that the attorney's paralegal prepared the schedules. As such, the Court is not persuaded that the difference in value between the schedules and the 2010 personal financial statement was the result of the Debtors' fraudulent intent. *See, e.g.*, *Harker v. West (In re West)*, 328 B.R. 736, 751 (Bankr. S.D. Ohio 2004) (debtor who used improper valuation standard on advice of attorney did not act with fraudulent intent under section 727(a)(4)).

The Plaintiff also complains that the Debtors granted their attorney a security interest in certain unencumbered personal property.  It argues the transfer is evidence that the Debtors are hiding assets.  To the contrary, the transfers were disclosed in the schedules as were the assets.

The Plaintiff's allegations concerning the accuracy of the Debtors' disclosure of income in response to Question 1 of the SOFA are speculative at best. Without ever suggesting what the Debtors' actual income was for 2011 and 2012 (which could have been accomplished by comparing the Debtors' responses to Question 1 to other indicia of the Debtors' income, like income tax

22

returns), the Plaintiff accuses the Debtors of misstating their income on the SOFA. Without a showing of what the correct income figure was, the Plaintiff's claims that the figures listed are inaccurate are simply unfounded. The Court will not speculate about facts and then infer intent.

It is true that there are deposits noted in the record that flow into various bank accounts, and that in the aggregate these deposits exceed the amount listed on the Debtors' SOFA. It also appears there are legitimate explanations for the difference. Many of the deposits appear to be transfers from one account to another. It is therefore possible to daisy-chain the origin of the funds, and doing so reveals that while some of the funds may have been income (for example, Mrs. Edwards' wages), many of the deposits were actually the same funds that were simply being transferred from one personal account to another. Further, the deposits and transfers included gifted funds and corporate funds that were, at least in part, expended on corporate debts. Thus, it appears there is an explanation for at least a large portion of the difference between the total of the deposits in the accounts and the income reported on the Debtors' SOFA. The Plaintiff failed to prove otherwise.

Instead, Plaintiff asks the Court to make assumptions about where the money came from and how it was used. The Court will not do so. Plaintiff has failed to carry its burden of proof with respect to the Debtors' response to Question 1 of the SOFA concerning their annual income as a ground for relief under either section 727 or section 523.

The $25,000 wire transfer received from Mr. Edwards' grandmother on July 10 was not disclosed on the SOFA. Likewise, payments of $14,300 to Citi Mortgage, $2,100 to Associated Bank, and $600 to Bayfield Electric were omitted from the SOFA.[3] The wire transfer and all three payments should have been disclosed on the SOFA.  Mrs. Edwards was not aware of either the deposit or the payments. Mr. Edwards explained that he did not disclose the wire transfer or the payments because he believed the funds were not "his" money, but rather money that belonged to his grandmother received for the purpose of making mortgage payments. Moreover, no sooner had he received the wire transfer than he spent all of the funds catching up on bills, including the mortgages. In addition, he admitted that failing to disclose both the wire transfer and the mortgage payments on his schedules "probably wasn't the right way to do it." Nevertheless, he denied intending to defraud any creditors by failing to disclose the wire transfer or the payments.

---

[3] Plaintiff makes other allegations concerning the Debtors' failure to disclose certain payments made within 90 days of the petition date, but with the exception of one $600 payment to Bayfield Electric on July 10, the remaining payments were below the $600 threshold required to be disclosed in response to question 3(a) of the SOFA.

The Debtors transferred a security interest in a boat and other assets to their attorney on the petition date, but did not list the transfer in response to question 3. Plaintiff alleges that they should have disclosed the security interest in response to question 3 on the grounds that it was made within 90 days of the petition date. Question 3(a) asks for disclosure of "all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case." While the granting of a security interest is a transfer, to the layman it is not a payment.

Mr. Edwards also acknowledged that he deposited approximately $5,400 into his children's accounts in September and October 2011. He testified that the deposits were made to repay sums he had borrowed from his children's savings accounts, and that he did not believe he was making a gift. He did not disclose the deposits on the schedules. There was no evidence he understood these to be payments to insiders.

In light of Mr. Edwards' testimony, and given the Court's experience with similarly-situated debtors, Mr. Edwards' explanation for his failure to disclose the wire transfer and the payments suggests that he genuinely did not intend to defraud creditors. Mr. Edwards testified that the period immediately preceding the petition date in his individual bankruptcy was "chaotic," and that he was, in essence, habitually robbing Peter to pay Paul. It is entirely plausible that Mr. Edwards truly believed that since he spent the funds received from his grandmother within a day of their arrival, they were never actually in his "possession" as he understood that term, and, as a result, need not have been disclosed. Likewise, it is entirely plausible that in the course of facilitating three roughly simultaneous bankruptcies, the omission of three payments within ninety days of the petition date was entirely accidental. Moreover, Mr. Edwards' failure to disclose the deposits into his children's accounts does not suggest improper intent. To the contrary, Mr. Edwards' testimony indicates that he was embarrassed to have borrowed money from his children and that he believed the arrangement was an informal, internal family matter. Although

25

his assumptions proved to be incorrect, his explanation was sufficiently

persuasive to permit the inference that his failure to disclose the transfers was

not motivated by intent to defraud.

The SOFA required the disclosure of the transfers of all property in the

two years before the petition date. Specifically, question 10 requires that

debtors "[l]ist all other property, *other than property transferred in the ordinary*

*course of the business or financial affairs* of the debtor, transferred either

absolutely or as security within *two years* immediately preceding the

commencement of this case . . . ." (emphasis added). The evidence shows that

the sale of the 2010 Sea Doo and the 2011 snowmobile were not disclosed on

the Debtors' schedules. The Edwards were obligated to disclose the transfer of

personal assets.

The omissions were all explained by the fact that Mr. Edwards frequently

bought, sold, and traded equipment and recreational vehicles during the

ordinary course of his business and personal affairs. This pattern was

consistent with past practices and was viewed by Mr. Edwards as ordinary.

While the meaning and importance of this disclosure requirement should have

been clearly explained by the Debtors' attorney, it was not. Instead, the

attorney left the preparation of documents to a paralegal.

The Court is satisfied the Debtors made good faith efforts to prepare the

schedules and the SOFA consistent with their understanding of the responses

that were required. Accordingly, Plaintiff's claim fails under both section

727(a)(2) and section 727(a)(4) with respect to the differences in value. The Debtors made efforts, based on their understanding of ordinary course of business and based on instructions from counsel to properly complete their schedules and the SOFA. The Court cannot conclude from the facts presented surrounding the wire transfer, the payments, or the transfers to their children that the Defendants possessed the requisite fraudulent intent to deny their discharge. Neither is there evidence that supports the conclusion that assets have been concealed. Accordingly, based on the testimony, the Court concludes that the Defendants lacked the requisite intent to deny their discharge under section 727(a)(2) or section 727(a)(4) with respect to these items.

With respect to Plaintiff's claims under section 727(a)(7) concerning Mrs. Edwards' conduct in the administration of the bankruptcies for Edwards Electric and Edwards Properties, these claims fail. There were simply no significant acts undertaken by Mrs. Edwards with respect to the business affairs of either Edwards Electric or Edwards Properties, and certainly none that endanger her discharge under section 727(a)(7).  To the extent such allegations also apply to Mr. Edwards, they are discussed separately below.

Likewise, Plaintiff's claims against Mrs. Edwards under section 523(a)(6) fail. The evidence clearly demonstrated that she had – at most – a marginal role in the household finances and in the preparation of the bankruptcy petition and schedules. To the extent she had a role, the Court sees no evidence

whatsoever of any nefarious intent. As such, all of the Plaintiff's claims are denied as to Mrs. Edwards.

*Claims Against Mr. Edwards*

The Plaintiff made a number of claims that specifically target Mr. Edwards. First, there are allegations concerning certain deposits into personal bank accounts.  As noted above, these deposits included funds received by gift and funds that belonged to Edwards Electric.  The Plaintiff argues that these deposits and transfers justify the refusal of discharge under section 727(a)(2). To satisfy the application of this section, "it must be shown that there was an actual transfer of valuable property belonging to the debtor which reduced the assets available to the creditor and which was made with fraudulent intent." *In re Agnew*, 818 F.2d 1284, 1289 (7th Cir. 1987) (citations omitted). In the present case, the testimony was that certain deposits or transfers occurred in order to avoid potential garnishment and to permit the company to continue to operate. The testimony was that the deposits were made for the purpose of facilitating payments to business creditors. The Debtors both testified that their sole purpose was to stay above water long enough to resuscitate the business.  They deny intending to defraud creditors.

Given the Debtors' explanations, the question is whether intentionally transferring funds to avoid a potential garnishment is sufficient to establish intent to hinder, delay, or defraud one's creditors. A few courts have faced similar facts and issued decisions on the question.

In *In re Cannell*, the debtor's discharge was denied after he ignored a citation to discover assets served on him by a creditor and transferred funds to his live-in girlfriend's account to avoid collection. Bankr. No. 12-71705, Adv. No. 12-07051, 2013 WL 2467787, at *5 (Bankr. C.D. Ill. June 7, 2013). In that case, service of the citation to discover assets had the state law effect of instantaneously perfecting a lien, for the unpaid balance of the creditor's judgment, on the debtor's tangible and intangible nonexempt personal property. *Id.* Upon being served, the debtor was obligated to hold his property in status quo until the creditor's rights were determined by a court. *Id.* Instead, after being served he made eight transfers to his girlfriend totaling $18,524.14. *Id.*

Even though the funds were used to pay ordinary household expenses, which, conceivably, could have been exempted from collection, the court noted that the debtor, an attorney, never sought approval for the transfers, nor did he claim them exempt. *Id.* Moreover, the debtor acknowledged making the transfers in order to avoid his creditor's collection efforts. *Id.* Accordingly, the court reached the "inescapable" conclusion that the transfers were made "with the express intent to hinder and delay the collection efforts of the Bank," and the debtor's discharge was denied under section 727(a)(2). *Id.*

Likewise, in *Camacho v. Martin (In re Martin)*, the District Court of Colorado concluded that an admission by the debtor that he transferred funds from one account to another in order to avoid garnishment established "a

29

prima facie showing that [he] transferred, removed, and concealed his bank account funds in an effort to hinder the appellants from recovering their judgment against him. Additionally, it demonstrates that the [debtor] tried to delay the appellants' attempt to collect their judgment." 88 B.R. 319, 323 (D. Colo. 1988). In that case, creditors obtained a state court judgment against the debtor, a doctor, for negligence. *Id.* at 320. To collect on the judgment, they successfully garnished the debtor's business bank accounts for a period of time until the debtor closed the accounts. *Id.* After closing the accounts, the debtor began transferring funds into new accounts that he used to operate his medical practice. *Id.* at 322. When he filed for bankruptcy, the debtor did not disclose these new accounts on his financial statements. *Id.* The debtor admitted that he closed the accounts in order to avoid garnishment, but argued that he did so in order to be able to pay other creditors. *Id.* at 323.

The court determined that the debtor's explanation was pretextual, and that he "clearly was playing 'hide and seek' with his assets in an effort to prevent [the creditors] from collecting their judgment against him." *Id.* Accordingly, the court concluded that the debtor possessed the requisite intent and denied his discharge under section 727(a)(2). *Id.*

In the present case, Mr. Edwards transferred corporate funds into personal accounts for the express purpose of trying to assure the availability of funds to continue the business. There is no evidence the choice hindered the collection efforts of any creditors or reduced assets available for corporate

30

creditors. There was no proof that any garnishment action was threatened or commenced, and the Plaintiff did not allege its own collection efforts were hindered by the transfers.

The Plaintiff next urges the Court to find that NSF checks drawn on a health savings plan by Mr. Edwards are a ground for both denial of discharge and a determination that the debts owed to it are nondischargeable. If every debtor who bounced checks in the run-up to filing bankruptcy was liable to have his or her discharge denied as a result, many discharges might be denied. Without more, the mere fact that the debtor wrote a check on an account that contained insufficient funds is not sufficient to deprive an otherwise honest debtor of a discharge. *Cf. In re Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992) (simply tendering a check for which there were insufficient funds was not "false pretense" for purposes of 11 U.S.C. § 523(a)(2)(A)); *Microtech Int'l, Inc. v. Horwitz (In re Horwitz)*, 100 B.R. 395, 398 (Bankr. N.D. Ill. 1989) (issuance of checks that later bounce does not constitute a false representation within meaning of section 523(a)(2)(A)).

As noted, section 727(a)(2) requires an act to hinder or defraud a *creditor* through the *transfer* or concealment of property. With the exception of check 1001 to Victory Medical Group, all of the checks from the HSA were written by Mr. Edwards to himself or to Edwards Electric. The writing of the checks were not acts against a creditor since the checks were written to Mr. Edwards

31

himself and to his business. Moreover, the fact that the checks were returned for insufficient funds establishes that there was no "transfer" of property.

The evidence shows that the sale of the 460 trencher and the New Holland E35 mini-excavator (corporate assets) were not disclosed on the schedules of Edwards Electric. Mr. Edwards, as the shareholder and officer who signed the schedules, had a duty to disclose the transfer of corporate assets other than in the ordinary course of business.

However, the omissions were all explained by the fact that Mr. Edwards frequently bought, sold, and traded equipment and recreational vehicles during the ordinary course of his business. Mr. Edwards and a former employee both testified that corporate equipment was frequently bought, sold, or traded. This pattern was consistent with past practices and was viewed by Mr. Edwards as ordinary.

While the meaning and importance of this disclosure requirement should have been clearly explained by his attorney, it was not. The Plaintiff failed to present evidence that the omissions were made with fraudulent intent. On that basis, and given that the testimony presented at trial did not create the impression that the Debtors had sought to defraud creditors, there is insufficient evidence to deny the discharge for omitting these items from the SOFA.

Section 727(a)(7) permits the denial of an individual debtor's discharge if the debtor engaged in any conduct described in paragraph (a)(2) through (a)(6)

32

of section 727 in connection with another bankruptcy case "concerning an insider." *Krehl*, 86 F.3d at 741. An insider is defined in 11 U.S.C. § 101 to include "corporations of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31). On the present facts, the bankruptcies involving Edwards Properties and Edwards Electric clearly involve "insiders." The Debtors were insiders and, therefore, their conduct in those proceedings fall within the possible purview of 11 U.S.C. § 727(a)(7). No evidence of any actions by Mrs. Edwards in those cases was presented and, accordingly, discussion of the application of this section will be focused on Mr. Edwards.

The Plaintiff's suggestions that Mr. Edwards should be denied a discharge in his individual bankruptcy case because of the decision to file bankruptcy on behalf of Edwards Properties and Edwards Electric is without merit. The Edwards Electric case was filed before the personal bankruptcy of the Edwards.  The Plaintiff has identified no authority for the proposition that the Debtors were somehow legally barred from filing bankruptcy on behalf of Edwards Properties.  Thus, these arguments fail.

Plaintiff argues that the income figures listed in response to Question 1 of the SOFA for Edwards Properties must be incorrect. However, as with the personal bankruptcy claims, Plaintiff offered no evidence to prove that the figure listed was inaccurate. Plaintiff relies entirely on two facts: that funds were deposited into corporate bank accounts in amounts that exceed the total income disclosed on the SOFA, and that the Debtors were able to pay an

33

attorney. Further, Mr. Edwards, his attorney's paralegal, and his accountant all testified that the tax returns for the corporation had not been prepared as of the petition date and, accordingly, the amount listed was a "placeholder" because the actual amount was unknown. In fact, the paralegal made the decision as to the amount to insert and explained her decision to Mr. Edwards. He accepted her explanation and assumed it was the correct method of addressing the situation. Again, this demonstrates a less-than-stellar attention to matters by counsel but it is plainly insufficient to prove that Mr. Edwards listed inaccurate income figures with the requisite fraudulent intent to justify denying his discharge.

Mr. Edwards admittedly deducted funds for health insurance and contributions to retirement accounts when calculating employee paychecks. The amounts withheld were not used to pay for health insurance or deposited into retirement accounts.  The finite funds available after payroll were spent on business operations. As noted, the Debtors settled an adversary proceeding brought by the employees and an order was entered on May 3, 2013, rendering the debts owed by Mr. Edwards to his former employees nondischargeable.

There is no dispute that through these actions the Debtors incurred a debt to each of the employees that was not paid prior to the petition date. As such, the employees held pre-petition claims in the Edwards Electric bankruptcy, and these claims were not scheduled by the Debtors. The failure to schedule these creditors could constitute a knowing, false oath that relates

34

materially to the bankruptcy case. *See, e.g.*, *Landis v. Aguirre (In re Aguirre)*, No.
12-14281, Adv. No. 12-01128, 2012 WL 8255587, at *3 (Bankr. E.D. Cal.
2012); *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 63–64 (E.D.N.Y. 2010); *Khalil
v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 177 (B.A.P. 9th Cir.
2007) (citations omitted).

Mr. Edwards testified that there were finite funds available and rather
than use them for insurance premiums or depositing them in retirement
accounts, he used the funds to keep the business afloat.  It was his intention
to repay the funds once he was able. There was no evidence offered concerning
his failure to schedule the claims of the employees. Accordingly, the Court
finds on the facts before it that the omission alone is an insufficient basis to
deny Mr. Edwards' discharge.

The Debtors' sales of the New Holland Skidsteer, the New Holland TC 29
tractor, the 460 trencher, and the New Holland E35 mini-excavator are
concerning because of the proximity to the replevin judgment in which the
sales occurred. The evidence shows the items were all sold between December
2010 and January 2011, and the replevin judgment was entered on November
4, 2010. However, the testimony of Mr. Edwards and a former employee
indicated that the purchase, sale, and trade of equipment was considered to be
part of the ordinary course of the Debtors' business. Mr. Edwards and a former
employee also made clear that equipment frequently wore out and needed to be
sold or traded.  The depreciation schedules show that dozens of pieces of

equipment were disposed of in that manner, and there was comparatively little credible evidence to suggest that the four pieces of equipment at issue here were disposed of with any fraudulent intent.

In addition, Mr. Edwards testified that he had been told by Plaintiff that it would refrain from executing on the replevin judgment if he continued making payments. He testified that he believed he could continue with "business as usual" which included buying, selling, and trading equipment if he also made payments as agreed. Such an understanding is, at least indirectly, supported by the fact the Plaintiff waited eighteen months to take action to execute on the judgment of replevin.

Finally, the last item of concern are the two white trailers that were allegedly hidden by the Debtors to avoid repossession. There was no evidence adduced at trial to suggest that the Debtors' failure to have the trailers present when Plaintiff executed its repossession action was motivated by a fraudulent intent. To the contrary, the bulk of the testimony suggested that the two trailers were part of a fleet of trailers, and that Mr. Edwards simply lost track of all of the items that were to be repossessed. The fact that the trailers were listed as "traded" on Edwards Electric's 2011 depreciation schedule was explained by the same plausible confusion. Plaintiff failed to carry its burden of proof concerning the two trailers, so this claim fails as well.

Based on the foregoing, the Court finds the Plaintiff has failed to satisfy its burden of proof that the actions of Mr. Edwards support denial of discharge

36

under 11 U.S.C. §§ 727(a)(2), (4) or (7).  Additionally, in the exercise of

discretion, the Court finds a grant of discharge appropriate because there is no

finding that the Debtors intended to violate the Bankruptcy Code.

As an alternative claim, the Plaintiff seeks a finding that the debt to it

that is personally guaranteed by the Debtors should be rendered

nondischargeable under section 523(a)(6). The Plaintiff generally asserts that

the sale of Plaintiff's collateral was conversion, and that because a writ of

replevin had already been issued prohibiting the sale of collateral, the sales in

violation of the writ were "malicious." The central focus of analysis for this

claim is whether Plaintiff suffered injury that was caused willfully and

maliciously by the Defendants within the meaning of section 523(a)(6).

With respect to the equipment, it is uncontroverted that the four pieces

of collateral sold after the replevin judgment were the Plaintiff's collateral. Mr.

Edwards used the proceeds from the sale to fund Edwards Electric and to pay

creditors (including, perhaps, payments to the Plaintiff). It is also undisputed

that after entry of the replevin judgment Mr. Edwards spoke with the Bank.  He

was told that as long as there were payments made to the Bank the business

could continue and no action would be taken on the replevin judgment.

Further, the bank officer said that "nothing would happen" if he sold

equipment as long as there were payments to the Bank.  The Plaintiff then took

no action to recover its collateral between obtaining a judgment in November

2010 and arranging for repossession in July 2012.

37

Accordingly, there is no basis to render the debt nondischargeable under section 523(a)(6) because there was no evidence of damage to the Plaintiff nor any showing that Mr. Edwards' actions were willful and malicious.

## IV. CONCLUSION

Whatever mistakes, errors, or omissions may have been made by the Debtors, Plaintiff has failed to present evidence that supports denial of discharge. It would be a gross over-punishment to deny either Mr. or Mrs. Edwards a discharge on these facts. Accordingly, the Court will enter judgment in favor of both Mr. and Mrs. Edwards dismissing Plaintiff's claims under section 727. Further, as discussed above, the Plaintiff has failed to establish that either Defendant committed a willful and malicious injury to another or to property of another.  For that reason, the Plaintiff's claims under 11 U.S.C. § 523(a)(6) are denied and dismissed.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be entered.

Dated:  December 19, 2013

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge